Thank you. I want to first start off by thanking the court for appointing me to represent Adam Burke. Yes, the court appreciates your willingness to accept the appointment. In this case, the district court erred from the beginning in a very major way, and that was allowing the prosecution's theory to come forward with evidence about violation of Minnesota law. From the conception of the indictment all the way through the presentation of evidence at the trial, the government relied upon, in essence, proving Mr. Burke violated a Minnesota law. They used that violation and that proof of violation to create materiality where materiality doesn't exist and shouldn't exist. I know all the parties have briefed the Minnesota runner statute extensively. I just want to comment on one point about the statute. As the court has seen from the briefs, somebody gets in an accident, they're entitled under car insurance to get paid or reimbursed for health care services. And Minnesota statute 65B controls that and controls that payment. There is a criminal statute that outlaws the use of runners in getting patients in motor vehicle accidents. And the government, from the beginning, from its indictment through the presentation of evidence at trial, has insisted that just the fact that you're using a runner creates this material aspect to an insurance company because it invalidates the payment. But that's an incorrect reading of Minnesota law. 65B subdivision 2A makes it clear that it's a conviction for 609-12 that separates that duty to pay. Is it a conviction or is it just a violation? Is that a distinction that makes a difference? It's a huge distinction that makes a difference, and it's a distinction that the district court glommed onto during the crafting of an attempt at a curative instruction where the district court termed it as a violation. But that's not what 65B-4-4 says. It's notwithstanding any other law in Minnesota law, an insurer has a duty to pay for all reasonable medical necessary medical expenses. And the government and the district court said, well, but we've got this 609-12 violation statute. Well, if you violate this. But subdivision 2A of 65B-4-4 says, quote, a person convicted of insurance fraud under section 609-611 or in the case of employment of runners under section 609-612, then the payments are not enforceable. What was that last section you're quoting? It's 65B-4-4 subdivision 2A. And the notwithstanding language creating what I believe was the real materiality issue that should have been the heart of the trial of whether or not the services Mr. Burke provided to his patients were reasonable medical necessity, that language is in 65B subdivision, 4-4 subdivision 1, paren B. So this is where the court erred in, one, allowing evidence absent of conviction. And let's make it clear, there's never been, Mr. Burke has never been convicted of 609-12 utilizing runners. And this is where the government pushed forward all of their evidence. The vast majority of the case was solely about proving a violation of 609-12. So is it, if I understand what you're saying, it's that so long as the medical service is reasonable, medically necessary, it doesn't matter whether you use a runner? It can't. So can you put the materiality on that decision, on when you say it can affect, sort of you shifting materiality from the medically necessary to the decision-making process of the insurance company and whether it's reasonably necessary? And I'll back up just a little bit. In United States v. Jane, this court talked a little bit about the medical necessity and materiality in relation to that. And I don't think Jane was making a hard and fast rule, as much as I might wish it was, that only materiality in relation to billing insurance companies relates to medical necessity and the reasonableness of that care. I don't think that's it, and that doesn't make any sense. There's a lot of things that can be material. The jig talks about materiality and what is material to somebody. But what the court did, and the mistake the court made in this case, was by putting so much emphasis on a violation of the statute, it essentially told the jury and allowed the government to present evidence that a violation automatically, per se, created materiality to an insurance company. I don't think that's not what the law says. It's not what the evidence should have been about. What do you do with the second sentence of 609-612, subdivision 2? Charges for any services rendered by a provider who violated this section are uncompensable. So subdivision 2 of 609-12 is essentially what happens when you get convicted. It's the creation of the criminal liability. But you can't enforce this subdivision. Nothing happens without a conviction. And I have limited time, and I wanted to save a little bit for rebuttal if there's a question that needs to be answered. Otherwise, I'd like to save a little time. That was my only question, if that's your answer. That's my answer, yes. Very well. We'll hear from Ms. Eck next. I thank all three of you for accepting your appointments under the Criminal Justice Act. The court appreciates your willingness to serve. You may proceed. Good morning. May it please the court, my name is Kate Linick, and I represent appellant Abdirahim Ibrahim. The government prosecuted Mr. Ibrahim for mail fraud and conspiracy to commit mail fraud based on the theory that he and his co-defendants sought to deceive car insurance companies about the fact that Mr. Ibrahim and others were referring patients to Burke Chiropractic in exchange for payment. And the indictment specifically with respect to Mr. Ibrahim alleges that he sought to defraud Request Insurance Company in relation to a patient named Yunus Ahmed and Geico Insurance Company in relation to a patient named Nur Ali. Now, Mr. Ibrahim has never disputed that he referred those patients to Burke Chiropractic or that Dr. Burke paid him to do that, but his convictions for mail fraud should still be reversed because the government failed to prove that he or the other defendants misled or sought to mislead Request or Geico about the fact that he was referring patients to Burke Chiropractic. And moreover, as Mr. Morrison mentioned, the government failed to prove that that fact would have been material to the insurance company's decision whether to pay claims. So I'll start by talking about the scheme to defraud element. The Eighth Circuit has held that to prove a scheme to defraud, the government has to prove a misrepresentation, an act of concealment, or an omission despite a legal independent duty to disclose. And here the government's case against Mr. Ibrahim focused mostly on a couple of documents. So Mr. Ibrahim signed a contract and he submitted invoices to Dr. Burke that incorrectly suggested that he was not getting paid based on the number of patients he referred to Dr. Burke. But the problem with the government's theory is that those documents were never sent or shown to anyone outside of Burke Chiropractic. Had the FBI not executed a search warrant, it's likely that nobody would have ever known the documents existed. So as a matter of law, those documents couldn't have concealed anything from the insurance companies or from anyone else. We also know that there are no other misrepresentations or acts of concealment that could have misled Request or Geico about the fact that Mr. Ibrahim was referring patients. Because representatives from both of those companies testified. And they testified that nothing in the claim files or discovered in the investigation of Ahmed and Ali's claims indicated one way or the other whether a so-called runner referred the patient to Burke Chiropractic. It's just withholding it though? Is that misleading? Isn't that a misrepresentation? Well, in this case, the government failed to prove there was any independent legal duty for Dr. Burke or anyone else to disclose that information to the car insurance. Even though under the statute, it's something that is at a minimum. It's disputed here sort of what exactly happens upon use of a runner. But even though there are restrictions under the state law for use of them.  But the statute doesn't impose any kind of disclosure duty on someone who violates the statute to confess their own crime. Moving on to the materiality argument, I know Mr. Morrison already touched on this. But I did want to address your question, Judge Colleton, about the interplay between the anti-runner statute and the No Fault Act. So it's true that the anti-runner statute, it does say that claims relating to a patient who was referred by a runner in violation of the anti-runner statute are non-compensable. They're not enforceable by the medical provider. But it is my argument that that particular provision of the Anti-Runner Act is overruled by another provision of the No Fault Act, which provides notwithstanding any other law to the contrary, a person entitled to benefits under this chapter, meaning Chapter 65B, the No Fault Act, is entitled to full medical expense benefits. And that includes, as Mr. Morrison noted, all reasonable expenses for necessary medical care. So to the extent the anti-runner statute could be read to say that those payments are not compensable, it's nullified by that competing provision of the No Fault Act. So it's your position, the way you read the statute, regardless of the use of a runner, if the services are medically necessary, Minnesota law requires that they be paid. Yes, Your Honor. And it all depends on whether the state wants to allocate resources to prosecute the case. Yes, Your Honor. And if the state says we can't prosecute all these runner cases, then the services are compensable. Yes, Your Honor. It's a matter for state regulators and prosecutors. And the government tries to get around the No Fault Act in a couple of ways. And one way is to say that it's okay if it's not material to the insurer's decision whether to pay the claim because it's material to their decision whether to investigate the claim. And the mail fraud statute just doesn't apply to that kind of fraud. The mail fraud statute doesn't criminalize all kinds of trickery and deceit. It only applies to a scheme to defraud a victim of money or property. And although an insurer might have a right to investigate a claim, it's not a property right. Well, I suppose their position is we investigate in an effort to protect our property, and if we investigate and find that something is amiss, then we would have an opportunity to avoid being deprived of our property. What about that? Yes, Your Honor. So the government has, I think, proven that it was material to the decision to investigate, but they haven't proven the second step, that that would predictably lead to or have a natural tendency to influence the ultimate decision, which is whether or not to pay the claim. You mean because 100 percent of these people who were recruited by runners were legitimate chiropractic care cases? Well, Your Honor, I would say it's the government's burden to prove that, had the government investigated or had the insurance companies investigated those claims, that the insurance companies probably would have found some kind of fact that would prove that those cases aren't medically necessary and that it would predictably have led them to refuse to pay those claims. Well, no, I understand that's the theory, and my question is why isn't that correct? Are you saying that 100 percent of these people were legitimate patients, or have they established that there were some percentage who were not legitimate, which would support an inference that fully investigating all of them would have led to more rejections? Well, Your Honor, I think in this case, you know, it's not our burden to prove that 100 percent of the patients who were cared for were receiving legitimate chiropractic care. It's the government's burden to prove that they were not receiving chiropractic care and that if the insurance companies had investigated further, that they would have found that out and predictably would have denied the claims. And with respect to the two specific patients who are listed in the counts against Mr. Ibrahim, that's Yunus, Ahmed, and Nirali, the insurance companies actually did investigate their claims for other reasons, and in both cases they ultimately decided to pay those claims. So at a minimum with respect to those two patients, the insurance companies did make a determination that their care was medically necessary. All right. Thank you for your argument. Ms. McCauley, we'll hear from you. Good morning. May it please the court. My name is Jennifer McCauley, and I represent the appellant Dana Kidd, Jr. I'd like to talk about the flawed jury instructions, if that's okay with the court. The jury instructions, you know, even if the court found, even though the district court did find that against our arguments as presented by my co-counsel here, even if the court didn't abuse its discretion in failing to dismiss the indictment or in the way that the pretrial rulings came down, after all the evidence came in and all the evidence tended to, from the government's standpoint, tended to point to a violation of the Minnesota runner statute in one way or another and did not tend to establish that there was any chiropractic care that was given that was unnecessary medically. Then it became necessary, and the defendants requested jury instructions that would mitigate the impact of this focus on the Minnesota runner statute as the jury was deliberating. And there were two areas that I focused on, that my client focused on, and one was a request for an instruction that clarified nondisclosure of referral fees paid to runners is not material if the chiropractic care provided was reasonable and necessary care for a motor vehicle accident. And that request was denied. And then the second thing that we objected to, a jury instruction that didn't clarify that mail fraud based on an omission in the absence of an independent duty to disclose wasn't material. So jury instructions are adequate if taken as a whole. They adequately advise the jury of the essential elements of the offenses charged and the burden of the proof required by the government. And it requires reversal if the failure to properly instruct was prejudicial. So it's your position also that the materiality simply goes to the medically necessary part, so that it can't be material just to the insurance company's decision whether or not to look into this, figure it out. Wasn't there testimony that if there was a runner used, it was more likely that perhaps it wasn't medically necessary? We wanted actually to clarify to the jury that a violation of the Minnesota runner statute alone did not create material representation because it was not disclosed. A violation alone was not enough. So you're also making the distinction between the investigation and actually the determination of it being not medically necessary. Correct. So these obviously rely on the arguments that have already been presented to the court and that were briefed on these issues. The big issue is that this came to the jury, and there was a way to mitigate the harm of all of this focus on the Minnesota runner statute, so that it didn't become the jury determining if the defendants were guilty of violating or participating in a violation of the runner statute. Because that interpretation, as we know from the district court's pretrial rulings, would not be acceptable. But the district court in those pretrial rulings seemed to adopt this idea that that wouldn't happen. But after all the evidence came in, it became pretty obvious that it would be very easy for a reasonable juror to misunderstand the impact of that law. And so the jury instructions became incredibly important to avoid prejudice to the defendants. And I see that I'm out of time if the court has any questions.  Thank you. Ms. Tessier, we'll hear from you for the government. Thank you, Your Honor, and may it please the court, Fanula Tessier on behalf of the United States. I'd like to try to address defense counsel's arguments in the order in which they gave them, if possible. First, I would note that the government's theory at trial did not rely on the Minnesota runner statute alone. In fact, the jury was expressly instructed, and this is at pages 1799 and 1800 of the trial transcript. They were expressly instructed not to decide whether or not the defendants violated state law, and that a violation of state law alone could not establish their guilt in this case. Rather, the government argued that the runner payments were the active concealment of the runner payments constituted fraud because the existence of those runner payments was a fact that was material to the insurers in their decisions whether to investigate and thus immediately pay the claims that were submitted by Dr. Burke. And the evidence showed that Dr. Burke was not just worried about whether he would ultimately get paid, but how much he would get paid and how quickly he would get paid. And in particular, I'd point the court to Government Exhibit 14, which was one of the undercover videos with Agent Beard, where Dr. Burke talks about how to get to ensure that he got paid more quickly and how that his payments would be more likely. In the just introductory paragraph of the second superseding indictment, the scheme is described as submitting claims and receiving reimbursements that were either not medically necessary or were not rendered. That's correct. So that's a universe of entirely improper services. That's correct, Your Honor. And that was another theory at trial. There were multiple theories on which the jury could have found the evidence sufficient. One, of course, the fact that the runner payments were material, which is also alleged in the indictment, where he said that the co-defendants worked together to actively conceal the runner payments, but also because the claims that they submitted were also for not just non-compensable services because of the runner payments, but also for medically unnecessary services. Well, the evidence at trial wasn't that they were all medically unnecessary, was it? The evidence, well, the government did not prove that every single one of the claims submitted by Dr. Burke, and I think there were 354 patients for whom he submitted claims where we had evidence of a runner payment. We did not prove at trial that every single one of those claims was not medically necessary, but we did prove that many of his claims were medically unnecessary and that he determined the patient's course of treatment without any regard to necessity, but rather based solely on his desire to get the maximum amount of money from the insurers. Now, we did prove that specific claims were unnecessary, not just for the particular counts of conviction, but for other counts as well. For the counts of conviction, of course, the undercover agents were faking their injuries, and Agent Beard in particular said at his 12th appointment that he no longer felt any pain, and he wrote that down on his form, and yet he was instructed by Dr. Burke to come in for another 12 appointments. When he complained about having to come in for that number of appointments, he was allowed to reduce them, not because that was what was best for his treatment, but rather because Dr. Burke was crediting the fact that Agent Beard was going to bring in other patients. For other patients, testified that the services, patient RM, patient AO, patient AJ, patient PG, all testified that the services did not help them. RM, this is at 974 to 81 of the transcript, said that she was told to come in three times a week, even though the treatments pained her. Patient PG, this is at 1011 and 1036, said he was told to come in four to five times a week, even though the treatments made his pain worse. And patient AJ, this is at 1075 to 76 and 1083 to 84, said that she felt obligated and pressured to attend her appointments even though they didn't help her. Patient AO and patient AJ also looked at specific bills that were submitted to the insurance companies and testified that they did not receive the payments for which the insurance companies had been billed. So, yes, there was much evidence of unnecessary treatment. Turning to defendants' arguments regarding the Minnesota runner statute, I'd like to note that they are conflating three separate provisions of the statute. Before you go to that, I just want to make sure I understood your first argument, which I thought was that the influence on investigation by itself is material. That's correct, Your Honor. Because you say the doctor wanted to be paid more quickly. He wanted to be paid more, not just paid more quickly, but also, as he said to Agent Beard, if the insurers find out about the runner payments, then they'll start to investigate. And he said that there will be patient depositions. He said, for example, I don't want anything that smells like a staged accident because then you have patient depositions and it creates all kinds of problems. So Dr. Burke in the videos is making clear that he wants to avoid investigations at all costs. And the reason to avoid investigations is not just because it will delay payment, but because often it would reveal that perhaps not all of the services were necessary and reduce the amount he would get paid. Well, that's an argument that it does come back in the end to medically necessary versus unnecessary. Yes. I thought you were making a broader argument, which is that even if everything was medically necessary, just the fact of investigations was material. Both are correct. Why is the latter correct? They would investigate and find these were all legitimate. Why is that mail fraud? The statute establishes that the payments for claims that are rendered in connection with a runner payment are non-compensable and unenforceable. But I'd also like to note. All right. If you accept that argument, then even if they're legitimate, they're non-compensable. I understand that. That's true. But I would also note that the materiality. And this question is all about whether the runner payments were material. And materiality does not require that the government prove that if the victim found out about this information, they absolutely definitely would not have engaged in the transaction. That's not the standard from Nader. The standard is, is this information that a reasonable person would want to know in deciding whether or not to engage in a transaction? And every single insurer testified that, yes, whether or not there was a runner payment is information that we would want to know in deciding whether or not to immediately pay out the claim or rather to investigate it. And I think that is sufficient to establish that the concealment of the runner payments was the concealment of a material fact. And they concealed that fact in order to get money from the insurance companies. Now, I will say it is also correct that the runner payments rendered the claims unenforceable. Defendant's argument to the contrary depends on, I think as Ms. Eck essentially admitted, rendering the non-compensable and unenforceable provision of 609.612 essentially a nullity. So there are three provisions here that are really important. One is 609.612 Subdivision 2. And that is the provision that says that not only are paying runner payments illegal, but also that charges for any services rendered by a health care provider who violated this section in regard to the person for whom such services were rendered are non-compensable and unenforceable as a matter of law. Now, that complements another provision that defendants discuss, 65B.44 Subdivision 2A. Now, that says that persons convicted under a runner statute cannot enforce a contract for payment. Whether or not that contract is related to a runner payment, they simply cannot enforce a contract for payment. And it provides that they can apply for relief from that provision after five years. So what that indicates is that 609.612 says that the claims in connection with the runner payments are unenforceable. And 65B.44 says that a person who has been convicted of paying runner payments can't make claims. So it's linked to the person as opposed to the claims. And those two provisions complement one another. And neither of those provisions are nullified by 65B.441B. That is the notwithstanding clause that defendants refer to. And that says that notwithstanding any other law to the contrary, a person entitled to basic economic loss benefits is entitled to full medical expense benefits. Now, that relates to the person making the individual patient, not the health care provider.  And they could get the benefits from someone who was not paying runner payments. But it's also important to look at the legislative history of those provisions. The notwithstanding provision was drafted just and signed by the governor just two weeks before the runner payment provision. And it doesn't seem reasonable to interpret the statute to think that the Minnesota legislature passed the notwithstanding provision, which the primary purpose of which was to ensure that insurers weren't placing preexisting limits on coverage. But they passed that provision. And then two weeks later passed a much more specific provision relating to the unenforceability of runner payments that was immediately rendered a nullity. So your position is that any time a runner is used, no payment. It's non-compensable. That the insurers are not required to pay. Now, one of the insurers testified that often when they investigate, they will sometimes make out a payment as a compromise. And I think that reflects the reality of the fact that it's often easier to pay a claimant than it is to litigate whether or not the claim must be paid. How would that litigation work if, in fact, there is a difference between a conviction and a violation? I mean, conviction, obviously, we know how that would end up one way or the other. But a violation, who gets to decide whether a violation occurred? Certainly. And presumably, this is unfortunately not laid out in the state case law and couldn't find very much explaining it. But if you just read the language of the provision, it says charges are rendered non-compensable and unenforceable. And I think the unenforceable is helpful there. And presumably, if Dr. Burke, for example, had submitted a claim to one of the car insurance companies for services that he rendered and the insurance company refused to pay it, then Dr. Burke might bring suit against the insurance company to try and obtain payment. And the insurance company might respond with 609.612 saying, nope, that claim is unenforceable. Of course, none of that, the court doesn't even have to get to any of this because, again, the runner payments were, the jury could find that the runner payments were material based upon the testimony of the insurers that the runner payments were material. So maybe the answer to this is obvious, but did you need the runner statute to bring this case? If you had the testimony that insurance companies said just the use of a runner is material for the following reasons, did you need the Minnesota anti-runner statute? No, Your Honor, we didn't need the statute. Then why include it if it only muddies the waters in terms of whether a defendant might be convicted of the underlying state statute as opposed to just the mail fraud? Well, I guess I would disagree with Your Honor that it muddies the waters because what I think is that the existence of the runner statute makes more clear why precisely the insurers found the existence of runner payments to be material. And the insurers explained why it was that runner payments were so important. It demonstrated to them that perhaps the patient didn't need the services at all because, as one insurer said, if you're injured, you'll find a chiropractor. You don't need a runner bringing you in. And it also made them concerned that perhaps the bills were inflated to cover the cost of the runner payments. And the district court made an express finding as to this in its denial of the post-trial motions for acquittal and said that Dr. Burke structured his bills and the treatments for his patients exactly to cover the runner payments. He told every patient, and Ryan Johnson who worked at Burke testified, that almost every one of their car accident patients was told to come in for 40 visits. Dr. Burke told Agent Beard, actually tell them to come in for 50 because then maybe they'll make 40. Almost none of the cash-paying patients were ordered to come in for 40 visits. And that's because, as Dr. Burke explains on the undercover videos, that's how he gets paid. If they just come in for a few visits, he's not even really breaking even. And why is he not breaking even? Because he's had to pay money to the runners, who then also paid money to the patients, in order to get them to come in for their visits. And I know, and I should have noticed this earlier, that the concealment of the patient payments was also a material fact that the jury could have found was at the center of the scheme to defraud. The defendants didn't just, I mean, it's very clear the evidence that they tried to cover up the per-runner, per-patient payments through a combination of the false contracts and the fake marketing event invoices. But they also tried to cover up the patients to payment, the payments to patients. Dr. Burke, there was one of the videos where Dr. Burke and Omar Samatar and Agent Beard are having a conversation, and Agent Beard brings up the payment that he was promised. And Dr. Burke says, I'm not going to be here for this conversation, walks out of the room, and as Omar testified at trial, motioned, keep your voice down. He didn't want anyone to hear about the patient payments. He told Agent Beard, if anyone comes in here asking me about getting paid as a patient, that's it, we're done, and said, they're federally prosecuting people. If we find out about this, we're toast. And he used the words federally prosecuting people. And so that fact as well was, of course, material to the insurers. As one of the insurers testified, if they found out about payments to patients, it might cause them to disclaim the entire claim, which is presumably not just the request for the chiropractic services, but any other claim that the car accident victim was making because of fraud. And so the cover-up of the patient payments was also a material fact on which the jury could rest its verdict against the defendants. If I may, I would just also like to briefly address some of the jury instruction arguments. First, I would note that there was no worry here that the jury would find, based on a violation of state law alone, given that instruction at 1799 and 1800, that you are not to find whether there is a violation of state law here. The district court also properly explained the materiality standard, and nobody is objecting to the materiality instruction accurately stating what constitutes a material fact. What the defendants wanted was they wanted the judge to tell the jury what facts were material and what facts were not material. And, of course, that's not the district court's job to do. As the Supreme Court explained in Gaudin, it's for the jury to find whether or not a fact is material. And then finally, as to the instruction on the scheme to defraud, the district court properly used the model jury instructions from the Eighth Circuit. The defendants asked that the word omissions be removed from that, but that, of course, is not what the law says. Omissions can be part of a larger scheme to defraud. Active concealment necessarily requires omissions. Omissions by themselves is the concern. That's correct. Omissions by themselves. Omissions by themselves. Our cases say there has to be some independent duty. That's correct. Are you saying the model instruction doesn't include the duty part? So the model instruction does not reference the duty to disclose. The model needs to be updated? The district court here did refer to a statement saying that concealment or nondisclosure itself is not enough. And so that was sufficient to explain to the jury that just mere omissions isn't sufficient. Now, if this were a case on a- Wait, wait, wait. Where was that statement you just quoted? That's in the jury instructions? That's in the jury instructions, yes. And the district court references it in his denial of the post-trial motions. This issue was raised post-trial. And the judge said, no, I said that concealment, mere nondisclosure, is not enough. And that was enough to convey the substance of Stephan to the jury. Now, if- Isn't it confusing, though, to say that in one instruction and to just say omission standing alone in the other? So the court never said omission standing alone. Well, I know it didn't have the word standing alone, but it just said omissions. It included omissions in the list of things that constitute a scheme to defraud because, of course, a scheme to defraud can include omissions. Now, if the request is that the judge- So if the government's theory at trial had been that this was an omissions case and that all that the government had proven was mere omissions coupled with a duty to disclose, then, yes, I think the district court should have instructed the jury in order to find a scheme to defraud based on omissions alone, you must find that there is an independent duty to disclose. But that's not what the theory was in this case. The government never argued that the defendants were guilty because they omitted information. They argued that the defendants were guilty because they actively concealed material information. So why was the omissions alternative in the instruction at all? Well, the omissions are still part of active concealment because active concealment, of course, requires an omission combined with acts to conceal that information from the victim. And so that's why the word omissions is included in there. And, yes, Your Honor, I suppose instructions could have been clearer. But, of course, the standard isn't whether or not the instructions are perfect, but whether they constitute an abuse of discretion for preserved arguments or whether they're plainly erroneous for unpreserved arguments. And certainly the instructions here did not constitute an abuse of the district court's discretion. I'd also note, as the district court found, that even if there were any error, the error was harmless, given the overwhelming evidence and essentially conceded evidence of active concealment here. I see that my time is up. If there are no further questions, thank you. Very well. Thank you for your argument. Mr. Morrison, we'll hear from you in rebuttal. I want to address an issue you raised, Judge, about whether or not the insurers could rely on the fact that runners were used and whether or not just the idea of being able to investigate runners creates materiality. I think the insurance companies have misapplied and misinterpreted Minnesota law regarding runners to create in their own minds that it is a material issue when, in fact, it's not. You heard the testimony of what the insurance companies were concerned about in the use of runners, that somebody who needs a runner who has to go to a chiropractor because a runner doesn't really need services. Well, we advertise for every service in this country. All medical care is advertised. You can't drive down a freeway without seeing a hospital saying we're the best trauma center in the region. That doesn't mean the hospital is overcharging patients to recoup that advertising capital. And that's the same thing that happens here. That's not a material issue. I want to take issue with whether or not there were patients who the government presented patients who didn't receive necessary medical treatment. Yes, we heard from patients who said the treatment hurt. That's not uncommon. People go into the doctor and don't like to see their doctor. We go to dentists and have teeth pulled. It hurts. That's part of medical practice. The government also pointed to their one witness, AO, who testified she didn't receive certain manipulations. There was testimony from Dr. Phil Troy and from Dr. Burke, which was documented in the SOAP notes, providing that patient with the medical treatment that the patient said, I didn't receive. It was done in a different manner because she hurt. Because they couldn't do the physical manipulations that she was perhaps expecting, they used a device that was allowable to be built. The point is here is that there was actually very little evidence in the overall scope of this record talking about whether or not Dr. Burke and his clinic provided adequate care. Instead, the little bits and pieces of that don't have a fair reading in front of this jury because this jury was overwhelmed with the use of runners and the violation of a Minnesota law.